Opinion by Judge WILLIAM A. FLETCHER; Dissent by Judge TALLMAN.
ORDER
This court’s opinion filed September 14, 2009, and reported at 581 F.3d 1063, is withdrawn, and is replaced by the attached Opinion and Dissent.
The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.
*636 The petition for rehearing en banc, filed October 29, 2009, is DENIED. Judge Tallman voted to grant the petition for rehearing en banc.
No further, petitions for rehearing or rehearing en banc will be accepted.
OPINION
W. FLETCHER, Circuit Judge:
The Center for Biological Diversity, the Western Land Exchange Project, and the Sierra Club (collectively, “Appellants”) bring suit against Asarco LLC (“Asarco”), a mining company, and the Department of Interior and the Bureau of Land Management (collectively, “BLM”). Appellants contend that the BLM’s approval of a land exchange violates the National Environmental Policy Act (“NEPA”), 42 U.S.C. §§ 4321-70; the Federal Land Policy and Management Act (“FLPMA”), 43 U.S.C. §§ 1701-87; and the Mining Law of 1872, 30 U.S.C. §§ 21-54.
If the proposed exchange does not occur, the land will continue to be owned by the United States. In that event, Asarco will be permitted to conduct mining operations on the land only if it complies with the Mining Law of 1872. Specifically, Asarco will not be able to conduct a new mining operation on the land without first submitting a Mining Plan of Operations (“MPO”) to the BLM. The MPO would have to include detailed information about the operations, management, monitoring, and environmental impacts of the proposed mining activities. The BLM would then have to approve the MPO before the new mining could proceed.
If the proposed exchange occurs, Asarco would take fee simple ownership of the exchanged land. In that event, Asarco’s use of the land would not be subject to the requirements of the Mining Law of 1872. Asarco has spent sixteen years, and considerable amounts of time and money, seeking to achieve private ownership of the exchanged land, which would allow Asarco to avoid having to prepare the MPOs that are required so long as the land remains in public hands.
As part of the process of approving the land exchange, the BLM prepared a Final Environmental Impact Statement (“FEIS”) pursuant to NEPA. In the FEIS, the BLM assumed without analysis that the MPO process would impose no constraints on, and would have no effect on, the manner in which Asarco would conduct new mining operations on the exchanged land. That is, the BLM assumed that the manner and extent of Asarco’s new mining operations would be the same whether or not the United States owned the land. Because of this assumption, the BLM did not compare the environmental effects of exchanging the land with the effects of not exchanging the land.
Under these circumstances, we hold that the BLM has not “taken a ‘hard look’ at the environmental consequences of its proposed action” in violation of NEPA, and that its action was therefore arbitrary and capricious. Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir.1998). We also hold that the BLM’s approval of the proposed land exchange was a violation of FLPMA and similarly arbitrary and capricious. Webb v. Lujan, 960 F.2d 89, 91 (9th Cir.1992). We therefore reverse the decision of the district court approving the actions of the BLM.
I. Background
Asarco owns and operates the Ray Mine complex in Gila and Pinal Counties, Arizona. The complex now includes a 265,000 ton-per-day open pit copper mine, a copper smelter with an acid plant, solution extraction/electrowinning plants, mills, con *637 centrators, leaching systems, and related support facilities. Ore from the mine is transported eighteen miles to the Hayden Smelter for processing. In 1996, the complex produced 430 million pounds of copper anodes, over 70 million pounds of copper cathodes, 1.3 million ounces of silver in concentrate, and 623,000 tons of sulfuric acid. The Ray Mine is the second most productive copper mine in Arizona and the third most productive copper mine in the United States.
In 1994, Asarco proposed a land exchange with the BLM that would consolidate its holdings and expand its mining operations at the complex. As amended in 1997, the proposed land exchange would convey to Asarco in fee simple thirty-one parcels of public land totaling 10,976 acres (the “selected lands”). In return, Asarco would convey to the BLM eighteen parcels of private land totaling roughly 7,300 acres (the “offered lands”). FLPMA authorizes the Secretary of Interior to approve land exchanges. 43 U.S.C. § 1716.
The United States owns, and the BLM administers as full estates, 8,196 acres of the selected lands. The remaining 2,780 acres of the selected lands are owned and administered as “split estates.” Asarco owns or is purchasing, in transactions not at issue in this appeal, the surface estate of these lands, while the United States owns and the BLM administers the mineral estate. Twenty-three of the thirty-one parcels of selected lands are located near the Ray Mine and the community of Ray, Arizona. Five of the parcels are located twelve to fifteen miles southeast of the Ray Mine, near the communities of Hayden and Winkleman, Arizona. The remaining three parcels are located about 50 miles west of the Ray Mine near the community of Casa Grande, Arizona.
The selected lands provide important wildlife and plant habitat, including high priority reintroduction habitat for desert bighorn sheep, 6,860 acres of endangered desert tortoise habitat, and potential habitat for threatened and endangered birds. Upland plant communities cover 99.2% of the selected lands and include riparian plant communities and three plant species designated for special status by the BLM. Some of the selected lands are immediately adjacent to the White Canyon Area of Critical Environmental Concern, and some are adjacent to or in close proximity to the White Canyon Wilderness. The selected lands include seventy-eight archaeological sites, of which forty are regarded as eligible for nomination to the National Register of Historic Places.
The selected lands are now encumbered by 751 mining claims or mill site claims under the Mining Law of 1872, of which 747 are held by Asarco. These claims are unpatented, and the BLM has not determined if they are valid. Every parcel of the selected lands except for Parcel CH-5 (comprising 480 acres) is encumbered by at least one such claim.
Asarco and the BLM are forthright in stating that they foresee the following five mining and mining-related uses for the selected lands following the land exchange. These uses are described, with specified acreage, in the FEIS as follows:
(1) Existing mining: 272 acres (2%) already have had and would continue to have substantial surface disturbance due to Asarco’s mining operations.
(2) Production operations and support areas: 3,614 acres (33%) would be used to expand open pits, construct haul roads, and deposit solution-extraction rock. This would result in substantial disturbance to between 25% and 100% of the land surface.
(3) Transition: 875 acres (8%) would be used as “raveling areas” around overburden and leach rock deposition areas, access *638 roads, storm water diversion ditches, and administrative facilities. This would result in some disturbance to between 5% and 25% of the land surface.
(4) Intermittent use: 4,481 acres (41%) would not be subject to direct mining activity and would be used to consolidate Asarco’s ownership and to buffer neighboring landowners from mining operations.
(5) Long-range prospect: 1,733 acres (16%) could be used for mine development and support in the future resulting in an unknown degree of surface disturbance.
The offered lands comprise five parcels or groups of parcels: the Knisely Ranch Parcels (160 acres), the Gila River Parcel (320 acres), the Tomlin Parcels (320 acres), the McCracken Mountain Parcels (6,384 acres), and the Sacramento Valley Parcel (120 acres). Following the land exchange, no mining claims would exist or be permitted on the Knisely Ranch Parcels. The BLM would petition to withdraw the Gila River Parcel and Tomlin Parcels from mineral entry, which, if successful, would mean that only persons who had established a valid mining claim before withdrawal would be permitted to mine on those parcels. Clouser v. Espy, 42 F.3d 1522, 1524-25 (9th Cir.1994). The McCracken Mountain Parcels, which comprise 87% of the offered lands, and the Sacramento Valley Parcel would remain open to mineral entry. Of the 7,300 acres of offered lands, 1,126 acres exhibit moderate potential for locatable mineral resources, with the rest exhibiting low potential for locatable mineral resources.
The offered lands include riparian plant communities and important wildlife habitat, including habitat for some special status species, potential habitat for some threatened or endangered species, including peregrine falcons, and proposed critical habitat for the cactus ferruginous pygmy owl. The offered lands include segments of the Gila River Riparian Management Area, the Black Mountains (Burro) Herd Management Area, the Cerbat (Wild Horse) Herd Area, the Big Sandy (Burro) Herd Management Area, and the McCracken Desert Tortoise Habitat Area of Critical Environmental Concern.
Between 1995 and 1997, the BLM consulted with various federal, state, and local agencies, elected representatives, non-governmental organizations, tribal governments, and private individuals concerning the land exchange. The BLM published a Draft Environmental Impact Statement (“DEIS”) in October 1998.
In January 1999, after having reviewed the DEIS, the federal Environmental Protection Agency (“EPA”) sent the BLM a three-page single-spaced letter accompanied by thirteen pages of single-spaced comments, vigorously objecting to the proposed land exchange. The EPA’s letter stated, inter alia:
Over the past several decades, approximately one billion tons of material have been excavated at the Asarco Ray complex. The proposed action would enable Asarco to excavate and process approximately three billion more tons over the next 40 years. In several meetings, letters, and conference calls with BLM since scoping for this project began in 1994, EPA has recommended that the DEIS provide certain information that we believe would be useful and relevant in a NEPA analysis for a land exchange where the foreseeable future uses of mining are known. In our comment letter on the preliminary DEIS, we stated that the document did not appear to have evaluated all reasonable alternatives and strongly recommended that additional information regarding the alternatives be included in the DEIS. In that letter and several others to the DEIS, we also recommended that *639 the potential impacts of the land exchange and the foreseeable future mining be discussed in much greater detail in the DEIS and specifically outlined the needed information.
Although BLM has not received an acceptable mine plan of operations (MPO) from Asarco, it appears that Asurco has fairly specific plans for the selected parcels. We believe that additional detailed information regarding geology, geochemistry, hydrology, and biological resources is relevant and necessary for this analysis to constitute full disclosure under NEPA. It is also evident that all reasonable alternatives have not been evaluated and that impacts of foreseeable activities on the selected lands have not been sufficiently addressed in the DEIS. We are extremely dismayed that the BLM has ignored most of our recommendations in finalizing the DEIS and are particularly troubled that the DEIS was published at a time when our headquarters office was still discussing the issues with BLM headquarters and the two agencies had not yet come to a resolution.
We have rated this DEIS as EO-2— Environmental Objections-Insufficient Information. We have strong objections to the proposed project because we believe there is potential for significant environmental degradation that could be corrected by project modification or other feasible alternatives.... We continue to contend that a substantial amount of information should be added to the EIS for BLM to meet its public disclosure obligation.
(Emphasis added.)
Public hearings were held on the DEIS. The BLM received sixty-one comment letters or notifications of no comment from interested individuals and groups. After reviewing and responding to these comments, the BLM issued its Final Environmental Impact Statement (“FEIS”) in June 1999. The FEIS differed from the DEIS in only minor respects.
The FEIS analyzes the environmental, cultural, and socioeconomic impacts of the proposed land exchange favored by Asarco (“the proposed exchange”); of the “Buckeye Alternative,” under which the selected lands would decrease to 10,176 acres and the offered lands to 6,659 acres; of the “Copper Butte Alternative,” under which the selected lands would decrease to 9,161 acres and the offered lands to 5,601 acres; and of the “No Action Alternative,” under which no lands would be exchanged. The FEIS identifies, but elects not to study in depth, seven other alternatives.
The FEIS states that the “foreseeable uses of the selected lands are mining-related uses and are expected to occur under all alternatives.” (Emphasis added.) In a section entitled “Actions Common to All Alternatives,” the FEIS explains:
This section describes actions that are common to all alternatives; that is, activities that would occur regardless of which alternative is selected. In developing alternatives, BLM concluded that foreseeable mining-related uses would likely occur whether any one of the land exchange alternatives were selected or the No Action alternative was selected. This is because a land exchange is not required for mining-related activities to take place on the selected lands. Asarco currently holds the vast majority of the mining claims on the public lands selected for exchange, and through these mining claims, Asarco has the right to pursue development on the selected lands for mining or mining-related uses.
The next paragraph contains a short, neutral description of the MPO process. The paragraph does not contain any discussion *640 of the manner in which the MPO process might alter mining operations. Then, on the next page, the FEIS states, “As explained above, foreseeable uses of the selected lands are assumed to be the same for all alternatives.” (Emphasis added.)
The BLM repeatedly stated in the FEIS its assumption that mining was the foreseeable use for the selected lands, and it repeatedly characterized the environmental impacts of mining operations, with or without the MPO requirement, as “common to all alternatives.” See, e.g., FEIS discussions of “Upland Plant Communities,” “Riparian Plant Communities,” “Wildlife/Wildlife Habitats,” “State and BLM Special Status Species,” “Biodiversity,” “Surface Water,” “Groundwater,” “Surface Water Rights/Well Permits,” “Air Quality,” “Soils,” “Access and Recreation.” The BLM’s assumption played a critical role in the FEIS. The FEIS contains only a single description of.the environmental consequences of mining because the BLM assumed that they would be the same under every alternative. That is, because the BLM assumed that mining operations would be the same, the FEIS contains no comparative analysis of the environmental consequences of the land exchange and the no action alternative.
The federal EPA, the federal Bureau of Indian Affairs, and the Sierra Club objected to the FEIS. The BLM summarized their objection as follows: “A Mine Plan of Operation is necessary to complete analysis of the land exchange impacts. BLM’s assumption is wrong that the foreseeable use reflects mining that would take place whether or not land exchange occurs." (Emphasis added.) The ROD did not answer the objection. Instead, it referred the reader to the FEIS. It stated, “This issue has been addressed in the FEIS General Response section 7.4.5 and 7.4.6.” In those sections of the FEIS, the BLM responded to the first sentence of the objection, stating that MPOs are not required for mining that is anticipated after the selected lands become privately owned. However, the BLM did not respond to the second sentence (italicized above), which objected to the BLM’s “assumption” that the same mining would occur with or without an MPO requirement.
In April 2000, the BLM issued a Record of Decision (“ROD”) in which it did two things. First, the BLM amended two existing Resource Management Plans (“RMPs”) to change the designation of the selected lands under FLPMA. It amended the 1988 “Phoenix RMP” to change the designation of 9,906 acres in the White Canyon Resource Conservation Area from “retention” to “disposal.” And it amended the 1993 “Safford District RMP” to change the designation of 433 acres in the Long-Term Management Area from “retention” to “disposal.” These changes in the Phoenix and Safford District RMPs were prerequisites to the conveyance of the selected lands from public ownership. As a consequence of these changes, the BLM would no longer be required to manage the selected lands as multiple-use lands under FLPMA.
Second, the BLM approved the proposed land exchange. Section 206 of FLPMA forbids land exchanges unless the “public interest will be well served.” 43 U.S.C. § 1716(a). This section directs the Secretary of Interior to “give full consideration” to better land management and “needs for lands for the economy, ... food, fiber, minerals, and fish and wildlife” when determining the public interest. Id. In part, the ROD justified the exchange by denying that any harm to the public would result from conveying the selected lands to private ownership. The ROD concluded that the public interest would not be harmed by the conveyance because it as *641 sumed, as the FEIS had assumed, that mining would be conducted in the same manner whether or not the exchange occurred. The ROD stated that “the BLM considers the continuation of mining as the foreseeable use of most of the selected federal lands whether the exchange occurs or not.”
In July 2001, Appellants filed an administrative appeal and a request to stay the land exchange with the Interior Board of Land Appeals (“IBLA”). When the IBLA failed to act on the Appellants’ request within forty-five days as mandated by 43 C.F.R. § 4.21(b)(4), Appellants filed suit in federal district court. The IBLA then stayed the land exchange pending its disposition of the appeal, and the district court suspended its proceedings pending a decision from the IBLA.
In August 2004, the IBLA denied the Appellants’ appeal. Ctr. for Biological Diversity, et al., 162 I.B.L.A. 268 (2004). One Administrative Judge wrote separately, concurring in the result. For her, the difficult issue was whether the BLM had complied with NEPA. She wrote:
I am perturbed by BLM’s assertion that foreseeable consequences of this exchange are not possible to predict or are speculative. It appears that the record contains considerable information indicating where within the selected lands mineral resources are located and where they are not. It is this information that forms the basis for the classification of foreseeable uses (“existing,” “production,” “transition,” “intermittent use,” and “long-range prospect”) identified for the selected lands in the FEIS. Further, BLM changed its land use designations for the vast majority of the selected lands in the Phoenix and Safford Resource Management Plans from “resource conservation area” and “long term management area” to “suitable for disposal” in the context of implementing this exchange decision.... Combining these two points of information — the knowable classifications within the context of mining of the selected lands with the change in land designation — made foreseeable impacts more easily presentable in a manner not easily found in this EIS and less speculative than BLM suggests.
Id. at 291 (Hemmer, Admin. J., concurring) (emphasis added) (internal citations omitted).
On June 6, 2007, the district court granted summary judgment to Appellees. Appellants timely appealed to this court.
II. Standard of Review
We review the district court’s grant of summary judgment de novo. United States v. Tacoma, 332 F.3d 574, 578 (9th Cir.2003). Under NEPA, “we must ensure that the agency has taken a ‘hard look’ at the environmental consequences of its proposed action---- [W]e must defer to an agency’s decision that is ‘fully informed and well-considered.’ However, we need not forgive a ‘clear error of judgment.’ ” Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir.1998) (internal citations omitted). We review the BLM’s compliance with NEPA under the deferential “arbitrary and capricious” standard of the Administrative Procedure Act. 5 U.S.C. § 706(2)(A); see The Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir.2008) (en banc). We also review the BLM’s compliance with FLPMA under the deferential “arbitrary and capricious” standard. See Webb v. Lujan, 960 F.2d 89, 91 (9th Cir.1992).
III. Discussion
For the reasons that follow, we hold that ’ the BLM’s assumption that mining would *642 occur on the selected lands in the same manner regardless of the land exchange was arbitrary and capricious, and that the BLM therefore violated NEPA. We further hold that the BLM’s reliance on this assumption in the ROD to conclude that the proposed land exchange is in the “public interest” was arbitrary and capricious, and that the BLM therefore violated FLPMA.
A. NEPA
In NEPA, Congress recognized the “profound impact” of human activities, including “resource exploitation,” on the environment and declared a national policy “to create and maintain conditions under which man and nature can exist in productive harmony.” 42 U.S.C. § 4331(a). To further this policy, NEPA “establishes ‘action-forcing’ procedures that require agencies to take a ‘hard look’ at environmental consequences.” Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir.2000) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). Chief among these procedures is the preparation of an environmental impact statement (“EIS”).
NEPA requires preparation of an EIS for “major Federal actions significantly affecting the quality of the human environment.” 42 U.S.C: § 4332(2)(C). Every EIS must “provide [a] full and fair discussion of significant environmental impacts” of the proposed agency action. 40 C.F.R. § 1502.1. An EIS serves two purposes:
First, [fit ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts. Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.
Dep’t of Transp. v. Pub. Citizen, 541 U.S. 752, 768, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (internal quotation marks and citations omitted).
In addition to the proposed agency action, every EIS must “[rjigorously explore and objectively evaluate all reasonable alternatives” to that action. 40 C.F.R. § 1502.14(a). The analysis of alternatives to the proposed action is “‘the heart of the environmental impact statement.’ ” Or. Natural Desert Ass’n v. Bureau of Land Mgmt., 531 F.3d 1114, 1121 (9th Cir.2008) (quoting 40 C.F.R. § 1502.14). “The existence of reasonable but unexamined alternatives renders an EIS inadequate.” Friends of Southeast’s Future v. Morrison, 153 F.3d 1059, 1065 (9th Cir.1998).
The FEIS prepared by the BLM examined the proposed land exchange and three alternatives: the Buckeye Alternative, the Copper Butte Alternative, and the No Action Alternative. Under the No Action Alternative, the exchange would not proceed, and the selected lands would remain in public hands. A no action alternative in an EIS allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action. The no action alternative is meant to “provide a baseline against which the action alternative[ ]”—in this case, the land exchange— is evaluated. Id. A no action alternative must be considered in every EIS. See 40 C.F.R. § 1502.14(d).
The BLM’s assumption in the FEIS that the environmental consequences of the land exchange alternative and the no action alternative would be the same was arbitrary and capricious. The BLM based its assumption that mining *643 would occur in the same manner on the fact that Asarco already holds mining claims on the selected lands. However, if the proposed land exchange does not occur, the selected lands would remain in public hands. In that event, Asarco’s ability to conduct mining operations on its claims would be subject to the Mining Law of 1872. In contrast, if the proposed land exchange occurs, Asarco would own the selected lands in fee simple. In that event, Asarco’s use of the land would not be subject to the requirements of the Mining Law. The BLM thus assumed that the Mining Law would have no impact on the manner in which Asarco will conduct mining if the selected lands remained public lands. A description of the operation of the Mining Law of 1872 shows why this assumption is arbitrary and capricious.
Asarco has a right to engage in mining on the selected lands under the Mining Law even if the exchange does not proceed, based on its 747 unpatented mining and mill site claims. See, e.g., 30 U.S.C. § 612(a) (holders of unpatented mining claims can engage in “prospecting, mining or processing operations and uses reasonably incident thereto”); United States v. Shumway, 199 F.3d 1093, 1105 (9th Cir.1999) (“The owner of a mining or mill site claim does not need a patent, or a vested right to issuance of a patent, to possess and use the property.”). But the manner and extent of that mining is likely to differ depending on whether the selected lands are owned by the United States as public lands or by Asarco as private lands in fee simple.
1. The MPO Requirement
If the land exchange does not occur and the selected lands remain public, Asarco will be obliged to comply with the requirements of the Mining Law. Under that law, Asarco would have to submit Mining Plans of Operations (“MPOs”) to the BLM before engaging in mining operations on its claims if those operations are greater than a “casual use” that would disturb more than five acres of land. See 43 C.F.R. §§ 3809.11, 3809.21. “Casual use means activities ordinarily resulting in no or negligible disturbance of the public lands or resources,” such as collection of mineral specimens using hand tools. Id. § 3809.5. It is clear from the FEIS that Asarco intends to engage in mining operations on the selected lands that would be greater than casual use, and that one or more MPOs would be required.
Each MPO would have to provide a significant amount of information on Asarco’s mining plans, including “maps ... showing the location of exploration activities, drill sites, mining activities, processing facilities, waste rock and tailing disposal areas, support facilities, structures, buildings, and access routes”; “[pjreliminary or conceptual designs, cross sections, and operating plans for mining areas, processing facilities, and waste rock and tailing disposal facilities”; “[w]ater management plans”; “[rjock characterization and handling plans”; “[q]uality assurance plans”; “[sjpill contingency plans”; “[pjlans for all access roads, water supply pipelines, and power or utility services”; reclamation plans that address “[d]rill-hole plugging,” “[r]egrading and reshaping,” “[m]ine reclamation,” “[rjiparian mitigation,” “[wjildlife habitat rehabilitation,” “[tjopsoil handling,” “isolation and control of acid-forming, toxic, or deleterious materials,” “[rjemoval or stabilization of buildings, structures and support facilities,” and “[p]ost-closure management”; a detailed monitoring plan to ensure compliance with environmental laws and regulations; a “[rjeclamation cost estimate”; and “[ojperational and baseline environmental information,” such as information on “geology, paleontological resources, cave resources, hydrology, soils, *644 vegetation, wildlife, air quality, cultural resources, and socioeconomic conditions in and around the project area,” as the BLM may request. See id. § 3809.401. The BLM may require information beyond that submitted with an initial MPO. “[Ijnsofar as BLM has determined that it lacks adequate information on any relevant aspect of a plan of operations, BLM not only has the authority to require the filing of supplemental information, it has the obligation to do so.” Great Basin Mine Watch, 146 I.B.L.A. 248, 256 (1998).
Further, depending on the circumstances, the MPO process requires BLM to consult with other agencies. For example, the selected lands include dozens of archaeological sites, many of which, according to the FEIS, would be destroyed or severely disturbed by mining operations. Consequently, the BLM may have to perform the consultation required under the National Historical Preservation Act. See 43 C.F.R. § 3809.411(a)(3)(iii). Similarly, the BLM may have to perform the consultation required under the Endangered Species Act and/or the MagnusonStevens Fishery Conservation and Management Act. See id. The BLM may also have to consult with Native American tribes. See id. § 3809.411(a)(3)(iv). It may also have to consult with the State of Arizona to ensure that Asarco — which in the past has violated the federal Clean Water Act at the Ray Mine Complex— complies with State water quality requirements. See id. § 3809.411(a)(3)(ix).
Still further, the MPO process requires the BLM to comply with NEPA. See id. § 3809.411(a)(3)(ii). NEPA requires the preparation of an EIS before approving an MPO if the approval would constitute a “major Federal actionf] significantly affecting the quality of the human environment.” 42 U.S.C. § 4332(2)(C). Based on the uses that Asarco and the BLM foresee for the selected lands, as detailed in the FEIS, it is virtually certain that BLM approval of an MPO for the selected lands would constitute a “major federal action.” Each EIS would have to provide detailed information on the environmental impacts of Asarco’s planned mining as outlined in the MPO.
Finally, the BLM cannot approve an MPO unless it complies with FLPMA. Under FLPMA, the Secretary of Interior is required to “take any action necessary to prevent unnecessary or undue degradation of the [public] lands.” 43 U.S.C. § 1732(b). BLM regulations define “unnecessary or undue degradation” (“UUD”) to mean “conditions, activities, or practices” that fail to comply with the “performance standards in [43 C.F.R.] § 3809.420,” that fail to comply with “other Federal and state laws related to environmental protection and protection of cultural resources,” that are “not ‘reasonably incident’ to prospecting, mining, or processing operations” as defined in 43 C.F.R. § 3715.0-5, or that “[flail to attain a stated level of protection or reclamation required by specific laws” in special status areas. 43 C.F.R. § 3809.5. FLPMA and its implementing regulations require the Secretary to “take any action necessary” to prevent UUD.
FLPMA’s requirement that the Secretary prevent UUD supplements requirements imposed by other federal laws and by state law. See id. § 3809.415 (“You prevent unnecessary or undue degradation while conducting operations on public lands by ... [Complying with § 3809.420, as applicable; the terms and conditions of your notice or approved plan of operations; and other Federal and State laws related to environmental protection and protection of cultural resources.”) (emphasis added). Prevention of UUD includes designing access routes that minimize ad *645 verse environmental impacts, § 3809.420(b)(1); disposing appropriately of “tailings, dumps, deleterious materials or substances, and other waste,” § 3809.420(b)(2); reclaiming disturbed areas, § 3809.420(b)(3); protecting fisheries, wildlife and plant habitat, § 3809.420(b)(7); and performing appropriate leaching operations and impoundments, § 3809.420(b)(12). UUD requirements are distinct from requirements under NEPA. “A finding that there will not be significant impact [under NEPA] does not mean either that the project has been reviewed for unnecessary and undue degradation or that unnecessary or undue degradation will not occur.” Kendall’s Concerned Area Residents, 129 I.B.L.A. 130, 140 (1994).
In Mineral Policy Center v. Norton, 292 F.Supp.2d 30 (D.D.C.2003), plaintiffs challenged newly promulgated regulations, including § 3809.420, implementing the UUD mandate of FLPMA. Plaintiffs’ central contention was that the new regulations were too weak to satisfy the statutory mandate of preventing UUD. The Department of the Interior (“Interior”) responded by arguing that the regulations would satisfy the mandate, in significant part because of the environmental protection provided by the MPO process. The district court wrote, “Interior argues that it will protect the public lands from any UUD by exercising case-by-case discretion to protect the environment through the process of: (1) approving or rejecting individual mining plans of operation.... ” Id. at 44. The BLM is, of course, part of Interior. It ill becomes Interior and the BLM to take the position in this litigation that the MPO process would not alter the manner of mining, and its environmental consequences, when Interior took precisely the opposite position in Mineral Policy Center.
2. Comparative Analysis
It is black letter law that NEPA requires a comparative analysis of the environmental consequences of the alternatives before the agency. In the case before us, that analysis would compare the environmental consequences of the no-action alternative, in which Asarco would own mining claims on public land, and the proposed land exchange alternative, in which Asarco would own the land in fee simple. Under the first alternative, Asarco would have to prepare and receive approval for MPOs in accordance with the Mining Law. Under the second alternative, no MPOs would be required.
In its 1999 letter to the BLM, the EPA objected strenuously to the draft EIS. The EPA noted that “it appears that Asarco has fairly specific plans for the selected parcels,” and the EPA “continue[d] to contend that a substantial amount of information should be added to the EIS for the BLM to meet its public disclosure obligation.” In her 2004 separate concurrence in the IBLA’s decision, Administrative Judge Hammer noted that she was “perturbed by BLM’s assertion that foreseeable consequences of this exchange are not possible to predict or are speculative.” She wrote that the information available to the BLM “made foreseeable impacts more easily presentable in a manner not easily found in this EIS and less speculative than BLM suggests.” As described above, the FEIS itself contains detailed information about the mining activities that Asarco intends to conduct on the selected lands, as well as the acreage to be devoted to such activities. It is thus plain from the record that both Asarco and the BLM have a fairly detailed knowledge of what Asarco intends to do if the proposed exchange is approved.
*646 In the circumstances of the case before us, where it is obvious, as detailed in the record, that Asareo and the BLM know a great deal about Asarco’s mining plans for the selected lands, NEPA requires a meaningful analysis of the different environmental consequences that would result from public ownership (with an MPO requirement) and private ownership (without an MPO requirement). This does not mean that the BLM must require, in connection with the preparation of the FEIS, that Asareo file full-fledged MPOs for the mining it will conduct on the selected lands. But it does mean that, based on the information now reasonably available, the BLM must make a meaningful comparison of the environmental consequences of Asarco’s likely mining operations with and without the requirement that MPOs be prepared by Asareo and approved by the BLM — that is, with and without the proposed exchange. In the absence of such a comparison in the FEIS, the BLM has not conducted the “hard look” that NEPA requires. Rather, the BLM has averted its eyes from what is in plain view before it.
We therefore conclude that the BLM acted arbitrarily and capriciously, and violated NEPA, by failing to take a “hard look” at the likely environmental consequences of the land exchange.
B. FLPMA
In FLPMA, Congress declared that it is the policy of the United States to manage the public lands “in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.” 43 U.S.C. § 1701(a)(8): Congress also declared it a national policy to manage the public lands “in a manner which recognizes the Nation’s need for domestic sources of minerals, food, timber, and fiber from the public lands.” Id. § 1701(a)(12). The BLM and the Secretary of the Interior are responsible for administering FLPMA and satisfying this multiple use mandate.
FLPMA forbids land exchanges unless the “public interest will be well served by making that exchange.” Id. § 1716(a). FLPMA directs the Secretary of the Interior, in considering the public interest, to “give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife.” Id. The Secretary must also “find[ ] that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired.” Id.
In approving the land exchange, the ROD emphasized what the BLM saw as the advantages of acquiring the offered land. Those advantages include: (1) facilitating better federal land management by acquiring private lands within special areas of designation that exhibit a “checker board” land ownership pattern; (2) improving wildlife and Area of Critical Environmental Concern habitats by adding parcels to federal protection and management; (3) supporting resource objectives for improving riparian zones by acquiring parcels along the Big Sandy and Gila Rivers; (4) continuing to support mining activities by providing lands that will enable Asareo to plan expansions, comply with environmental permits, buffer operations from surrounding lands, and continue operating on parcels with approved mining plans of operations; and (5) improving management of mineral rights.
*647 The ROD listed no disadvantages of conveying the selected lands into Asarco’s private ownership. The ROD stated, “An additional rationale for approving the land exchange is that the BLM considers the continuation of mining as the foreseeable use of most of the selected federal lands whether the exchange occurs or not.” In other words, the ROD, like the FEIS, assumed that mining would occur on the selected lands in the same manner whether or not the exchange took place. For the reasons discussed above, this assumption is unreasonable. The manner in which Asarco engages in mining on the selected lands is likely to differ depending on whether the land exchange occurs, and the environmental consequences will differ accordingly.
Because the ROD unreasonably assumed that mining would occur in the same manner, its analysis of the public interest under FLPMA is fatally flawed. Without an accurate picture of the environmental consequences of the land exchange, the BLM cannot determine if the “public interest will be well served by making the exchange,” and the Secretary cannot determine if the “values and the objectives” which the selected lands “may serve if retained in Federal ownership are not more than the values” of the offered lands. We therefore hold that the conclusion in the ROD that the proposed land exchange is in the “public interest” within the meaning of FLPMA was arbitrary and capricious.
C. Resource Management Plans
In addition to approving the land exchange, the ROD approved changes to two Resource Management Plans (“RMPs”). First, it amended the Phoenix RMP by changing the designation of 9,906 acres of selected lands in the White Canyon Resource Conservation Area from “retention” to “disposal.” Second, it amended the Safford District RMP by changing the designation of 433 acres of selected lands in the Long-Term Management Area from “retention” to “disposal.” These changes were necessary in order to allow the conveyance of most of the selected lands into private hands.
Amending a resource management plan ordinarily constitutes “major federal action” requiring NEPA analysis. See Klamath Siskiyou Wildlands Ctr. v. Boody, 468 F.3d 549, 560-62 (9th Cir.2006). The BLM accordingly treated the plan amendments as major federal actions and analyzed them in the FEIS. As part of the no action alternative, the FEIS assumed that neither the land exchange nor the proposed amendments to the RMPs would take place.
For the same reasons that the analysis in the FEIS of the land exchange is inadequate under NEPA, so too is the analysis of the proposed RMP amendments. By assuming that mining would occur in the same manner and to the same extent on the selected lands regardless of whether the exchange occurred, the BLM assumed either that the RMPs would be amended even if the exchange did not occur, or that even if the RMPs were not amended the existing RMPs would not affect Asarco’s mining plans. There is nothing in the record supporting the first assumption that the RMPs would be amended absent the exchange, especially given that the BLM acknowledges that the amendments were prerequisites to the land exchange. And the second assumption' — -that the unamended RMPs would have no effect on mining — suffers from the same flaws discussed above. Just as the BLM must consider the constraints imposed by the MPO requirement for the no action alternative to the land exchange, so too must it consider the constraints the RMPs would *648 impose if the amendments did not occur. We note that 94% of the selected lands are currently subject to RMPs.
The Appellants did not directly challenge the RMP amendments in their appeal to us. However, we note the incongruity of holding that the analysis in the FEIS of the no action alternative violates NEPA with respect to the land exchange but not with respect to the RMP amendments if the same erroneous assumption infects them both. We leave it to the district court to address this issue, as appropriate, on remand.
D.Mining Law of 1872
We do not reach the question whether the Mining Law of 1872 would be violated if the land exchange were to be effectuated on the current record.

E.Lands Council

The dissent argues that our decision in this case is inconsistent with our recent en banc decision in The Lands Council v. McNair, 537 F.3d 981 (9th Cir.2008) (en banc). We disagree.
We wrote in Lands Council that “our proper role is simply to ensure that the [agency] made no ‘clear error of judgment’ that would render its action ‘arbitrary and capricious.’ ” Id. at 993. In Lands Council, we insisted that agencies support and explain their conclusions with evidence and reasoned analysis. Id. at 994, 998.
Lands Council involved a challenge to a logging project proposed by the Forest Service. There were three NEPA issues. First, plaintiff Lands Council argued that the Forest Service had “fail[ed] to include a full discussion of the scientific uncertainty surrounding its strategy for maintaining species viability.” Lands Council, 537 F.3d at 1002 (internal quotation omitted). Second, Lands Council argued that the Forest Service “did not cite adequate evidence that the Project will improve the habitat of old-growth species.” Id. Third, Lands Council argued that the Forest Service “did not adequately examine adverse impacts from logging within old-growth stands.” Id. We concluded that these three arguments failed and that the Forest Service had taken “the requisite ‘hard look’ at the environmental impacts of the Project.” Id. at 1003.
The NEPA issue in the ease now before us is quite different from the NEPA issues in Lands Council. Instead of alleged failures to discuss scientific uncertainty, to cite adequate evidence, or to examine adverse impacts, as in Lands Council, the issue in our case is a failure to make a meaningful comparison among alternatives before the agency. It is black-letter law under NEPA that such a comparison is required. See 40 C.F.R. § 1502.14 (As the “heart of the environmental impact statement,” the EIS “should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among the options by the decisionmaker and the public.”). We so indicated in Lands Council: “The EIS must include statements on: ... alternatives to the proposed action.” Lands Council, 537 F.3d at 1001. We concluded in Lands Council that an adequate comparative analysis had been conducted. Id. at 1003.
There is nothing in the record supporting the BLM’s assumption that the MPO process would make no difference in the manner in which Asarco would perform mining operations on the selected lands. Instead, there is much in the record indicating precisely the opposite. We will not repeat here everything we have written above, but we note a few things.
*649 We note that an “extremely dismayed” EPA objected to the draft EIS, complaining, “It is also evident that all reasonable alternatives have not been evaluated and that impacts of foreseeable activities on the selected lands have not been sufficiently addressed in the DEIS.” The FEIS was not changed in response to this objection.
Further, we note that the EPA objected to the FEIS, writing that there was no support for the assumption that Asarco would mine in the same fashion whether or not it was required to prepare MPOs. The BLM failed to respond to this objection.
Still further, we note that in her concurring opinion for the IBLA, Administrative Judge Hammer pointed out that the record contains detailed information about the nature of Asarco’s planned mining operations that “made foreseeable impacts more easily presentable in a manner not easily found in this EIS and less speculative than BLM suggests.”
Finally, we note that the Department of Interior, of which the BLM is a part, successfully argued in Mineral Policy Center that MPOs provide meaningful environmental protection beyond that provided by other laws. In light of Interior’s successful argument in Mineral Policy Center, we can hardly be expected to take at face value Interior’s and the BLM’s contrary argument, in the case now before us, that the MPO process provides no such environmental protection.
Our dissenting colleague makes a number of general statements. He says that we have “disingenuously” removed material from our prior opinion, Dissent at 651; that we are “attempting to mask [our] creation of a new substantive rule,” id. at 652-53; that we are “attempting to judicially legislate,” id.; that we provide “selective and somewhat misleading presentation of the facts,” id. at 654 n. 4; that our opinion “solely focuses on an isolated phrase from the record, taken entirely out of context,” id. at 657; that our “rumination is unaccompanied by any factual basis from the administrative record,” id. at 658; that we impose a “novel NEPA requirement steeped in mystery,” id. at 660; that we make a “false statement that the BLM failed to make a meaningful comparison,” id. at 660; that we “attempt to regulate agency action by judicial fiat,” id. at 661; that we “grossly overstep our role,” id. at 662; and that we “have sacrificed the integrity of our precedent and the best interests of the public,” id. at 665.
But our colleague has no response to the fact that an “extremely dismayed” EPA objected that the BLM did not perform an adequate environmental analysis in the draft EIS. His only response to the fact that the BLM did not reply to the EPA’s statement that the FEIS was wrong in assuming that Asarco would mine in the same way, whether or not it prepared MPOs, is to quote language replying to another objection. His only response to the fact that Administrative Judge Hammer wrote a concurrence stating that the BLM possessed sufficiently detailed information to provide a more thorough environmental analysis is to point out that she was writing a concurrence. Id. at 664 n. 9. His only response to the fact that the position taken by Interior and the BLM in this litigation is flatly inconsistent with the position taken by Interior in Mineral Policy Center is to deny the existence of the inconsistency. Id. at 658-59 n. 6.
Our colleague states that the BLM found that the environmental consequences of the proposed exchange would be “similar” to those of the no-action alternative. He writes, “[T]he BLM reached the logical conclusion that, to the extent foreseeable, the environmental impacts would be in many ways similar under the *650 various alternatives.” Id. at 658 (emphasis added). He writes, further, “[The BLM’s] expertise led it to believe that the environmental consequences would be similar whether Asarco mined on public or private land.” Id. at 658-59 n. 6 (emphasis added). See also id. at 658-59 (“ultimate mining-related activities would be substantially similar”); id. at 658-59 n. 6 (“the BLM’s position here — that environmental impacts would be similar under the various alternatives”); id. (“The BLM’s conclusion that Asarco’s mining-related activities would be similar ”) (emphases added). Our colleague errs in so stating. The core problem in this case is that the BLM assumed that the environmental impacts of the proposed exchange and of the no action alternative would be “the same.”
Our colleague writes that our opinion is “based on a distaste for the particular industrial goals at issue.” Dissent at 659. This is not true. We express no view— indeed, we have no view — on the question whether the proposed land exchange is a good or bad idea. That question is not properly before us. But our colleague has a very definite view. In his view, the land exchange is “beneficial.” Dissent at 651-52. In his view, the “offered lands ... are undisputably superior in almost all respects (except for mineral deposits) to the selected lands.” Id. at 665. In his view, our approach is not only “legally untenable.” Id. at 665. It is also “impractical, misguided, and contrary to the best interests and welfare of the public at large.” Id.
We confine ourselves to the legal questions before us. We continue to adhere to the standard of deference to agency action we articulated in Lands Council. But we are not compelled to defer — indeed, we are compelled not to defer — when an agency has acted arbitrarily and capriciously. In this case, we conclude that the BLM acted arbitrarily and capriciously in assuming without explanation that the MPO process is a meaningless formality that provides no environmental protection and, based on that assumption, in failing to make a meaningful comparison between the proposed land exchange and the no action alternative.
Conclusion
We conclude that the BLM acted arbitrarily and capriciously, in violation of NEPA and FLPMA, in assuming without explanation that Asarco would perform mining operations on the selected lands in the same manner regardless of the land exchange. In failing to perform a comparative analysis of the likely environmental consequences of the proposed land exchange, on the one hand, and the no action alternative, on the other, the BLM failed to take a “hard look” at the environmental consequences of the exchange in violation of NEPA. We hold further that the conclusion in the ROD that the proposed land exchange is in the “public interest” within the meaning of FLPMA was arbitrary and capricious because it was based on the BLM’s flawed assumption.
We therefore REVERSE the decision of the district court approving the action of the BLM. We REMAND for further proceedings consistent with this opinion.