### WESTERN WATERSHEDS PROJECT, Plaintiff,

### v.

### Ken SALAZAR, in his official capacity as Secretary of the United States Department of the Interior, et al., Defendants.

### Case No. CV 11–00492 DMG (Ex).

United States District Court,
C.D. California.

Nov. 5, 2012.

---

Daniel P. Garrett–Steinman, Jamey M. B. Volker, Joshua A. H. Harris, Law Offices of Stephan C. Volker, Oakland, CA, Stephan Coles Volker, Stephen C. Volker Law Offices, Oakland, CA, for Plaintiff.

David B. Glazer, US Department of Justice, Environmental Enforcement Section, San Francisco, Michael R. Eitel, US Department of Justice, Environment and Natural Resources Division—Wildlife Section, Denver, CO, Michael D. Thorp, United States Department of Justice Natural Resources Section Washington, DC, for Defendant.

**ORDER RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND INTERVENOR'S MOTION FOR SUMMARY JUDGMENT**

DOLLY M. GEE, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment. The Court held a hearing on January 27, 2012. Having duly considered the respective positions of the parties, as presented in their briefs and at oral argument, the Court now renders its decision. For the reasons set forth below, Plaintiff's motion is DENIED and Defendants' and Intervenor's motions are GRANTED.

## I.

### *PROCEDURAL HISTORY*

On January 14, 2011, Plaintiff Western Watersheds Project filed a complaint against the United States Department of the Interior ("DOI"); Ken Salazar, the DOI Secretary, in his official capacity; the United States Bureau of Land Management ("BLM"); Bob Abbey, the BLM Director, in his official capacity; the United States Fish and Wildlife Service ("FWS"); Rowan Gould, the FWS Director, in his official capacity; and Ren Lohoefener, the FWS Regional Director for the Pacific Southwest Region, in his official capacity (collectively, the "Government"). On April 18, 2011, the Court granted Intervenor Defendant BrightSource Energy Inc.'s unopposed motion to intervene [Doc. # 26]. Plaintiff filed the operative first amended and supplemental complaint on July 8, 2011 [Doc. # 66]. Plaintiff seeks declaratory and injunctive relief under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Federal Land Policy and Management Act, 43 U.S.C. § 1701 *et seq.*, and the

Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*

On June 27, 2011, Plaintiff filed a motion for preliminary injunction and application for temporary restraining order ("TRO") seeking injunctive relief based solely on its NEPA claims [Doc. # 26]. The Court denied Plaintiff's application for TRO on June 30, 2011 [Doc. # 58] and denied Plaintiff's motion for preliminary injunction on August 10, 2011 ("PI Order") [Doc. # 94]. The Ninth Circuit subsequently affirmed this Court's denial of preliminary injunctive relief. *W. Watersheds Project v. Salazar,* 692 F.3d 921 (9th Cir.2012).

Plaintiff filed a motion for summary judgment on October 14, 2011 [Doc. # 111]. On November 4, 2011, Defendants and Intervenor filed briefs in opposition to Plaintiff's motion for summary judgment and in support of summary judgment in their favor (respectively, "Defs.' Mot." and "Intervenor's Mot.") [Doc. ## 118, 119]. On November 29, 2011, Plaintiff filed two briefs, each addressing different substantive issues,[1] in opposition to Defendants' and Intervenor's cross-motions for summary judgment and in reply to their opposition to Plaintiff's motion for summary judgment (respectively, "Pl.'s NEPA Reply" and "Pl.'s FLPMA/ESA Reply") [Doc. ## 123, 124]. On December 16 and 20, 2011, respectively, Defendants and Intervenor filed replies to Plaintiff's opposition to their cross-motions for summary judgment (respectively, "Defs.' Reply" and "Intervenor's Reply") [Doc. ## 126, 127].

## II.

### *FACTUAL BACKGROUND*

The undisputed facts underlying this case are set forth in detail in the Court's Order denying Plaintiff's motion for a preliminary injunction [Doc. # 94] and are not repeated here. The cross-motions for summary judgment do not raise any new controverted factual issues. The parties' dispute stems from Defendants' decision to approve Intervenor's application to construct the Ivanpah Solar Electric Generating System ("ISEGS"). In general, Plaintiff contends that Defendants inadequately considered the project's effect on existing populations of desert tortoise and avian species.

## III.

### *LEGAL STANDARD*

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Partial summary judgment may be sought on any claim or defense, or part thereof, and the court may grant less than all of the relief requested by the motion. *See* Fed. R.Civ.P. 56(a), (g). All parties agree that this matter can be resolved on the record before the Court and that summary judgment is therefore appropriate.

When considering challenges to agency action for failure to adhere to the NEPA, FLPMA, or ESA, district courts review the decision at issue under the APA. *W. Watersheds Project v. Kraayenbrink,* 632 F.3d 472, 481 (9th Cir.) (citing *Ctr. for Biological Diversity v. U.S. Dep't of Interior,* 581 F.3d 1063, 1070 (9th Cir.2009); *Or. Natural Res. Council v. Allen,* 476

---

1. One of Plaintiff's briefs—though formally a reply to Defendants' opposition and opposition to Defendants' motion—addresses both Defendants' and Intervenor's arguments regarding Plaintiff's NEPA claims. Plaintiff's other brief is captioned as a reply to Intervenor's opposition and opposition to Intervenor's motion, but in fact addresses both Defendants' and Intervenor's arguments with respect to Plaintiff's FLPMA and ESA claims.

F.3d 1031, 1036 (9th Cir.2007)), *cert. denied*, —— U.S. ——, 132 S.Ct. 366, 181 L.Ed.2d 232 (2011). The APA requires that the agency action be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir.2010) (quoting 5 U.S.C. § 706(2)(A)).

Review under the "arbitrary and capricious" standard is narrow; courts may not substitute their judgment for that of the agency. Rather, courts "will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the prob-lem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.2008) (*en banc*) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir.2006)), *overruled on other grounds by Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). The APA thus mandates a "highly deferential standard" of review,[2] and "[t]his deference is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." *Allen*, 615

---

2. The parties disagree about the appropriate degree of deference in the NEPA context. Plaintiff, contending that "the main NEPA issues in this case are *legal*—not factual—in nature," urges the Court to adopt a "reasonableness" standard, which Plaintiff envisions would involve "a more searching inquiry." (Pl.'s NEPA Reply at 2–3.) Plaintiff's most recent support for this proposition comes from *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 449 F.3d 1016, 1028 (9th Cir.2006), in which the Ninth Circuit considered what it described as a primarily legal issue: "whether NEPA requires consideration of the environmental impacts of a terrorist attack." *Mothers for Peace* reviewed this legal issue "for reasonableness" because "it makes sense to distinguish the strong level of deference we accord an agency in deciding factual or technical matters from that to be accorded in disputes involving predominately legal questions." *Id.* at 1028 (quoting *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th Cir.1995)) (internal quotation marks omitted).

In setting forth this dichotomy, *Mothers for Peace* drew upon a line of Ninth Circuit cases extrapolating from language in *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). *Marsh* involved a dispute over an agency's obligation to prepare a supplemental environmental impact statement ("EIS") in light of new information that had become available.

Characterizing this question as "a classic example of a factual dispute the resolution of which implicates substantial agency expertise," the Supreme Court held that the arbitrary and capricious standard of review applied. *Id.* at 376, 109 S.Ct. 1851. *Marsh* distinguished the issue in that case from disputes that "turn on the meaning of the term 'significant' or on an application of this legal standard to settled facts." *Id.* at 377, 109 S.Ct. 1851. From this discussion in *Marsh*, the Ninth Circuit concluded that "[t]wo standards govern ... review of an agency's NEPA actions. [Courts] review factual disputes, which implicate substantial agency expertise, under the arbitrary and capricious standard. [Courts] review legal disputes under the reasonableness standard." *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1508 (9th Cir.1997) (internal citations omitted).

In practice, "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great ... consequence." *Marsh*, 490 U.S. at 377 n. 23, 109 S.Ct. 1851 (citing *Manasota-88, Inc. v. Thomas*, 799 F.2d 687, 692 n. 8 (11th Cir.1986); *River Rd. Alliance, Inc. v. Corps of Eng'rs of U.S. Army*, 764 F.2d 445, 449 (7th Cir.1985)). Though there may be cases in which the difference between these two standards is dispositive, this is not such a case. Plaintiff's NEPA claims fail under either standard.

F.3d at 1130 (citing *McNair*, 537 F.3d at 993).

## IV.

### DISCUSSION

#### A. Plaintiff's NEPA Claims

NEPA imposes procedural requirements rather than substantive environmental standards or outcomes. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1131 (9th Cir.2011) (citations omitted). These procedural requirements serve the statute's twin purposes: "to ensure that the agency proposing major federal action 'will have available, and will carefully consider, detailed information concerning significant environmental impacts,' " and "to guarantee that the relevant information will be made available to the larger public audience." *S. Coast Air Quality Mgmt. Dist. v. FERC.*, 621 F.3d 1085, 1092 (9th Cir. 2010) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)) (citing 42 U.S.C. § 4332(2)(C)).

In moving for summary judgment on its NEPA claims, Plaintiff reiterates the grounds that it previously asserted in support of a preliminary injunction and that the Court largely rejected. To avoid recapitulating the Order denying Plaintiff's motion for a preliminary injunction, the Court confines the present discussion to those aspects of the Order with which Plaintiff takes issue or to new arguments that Plaintiff raises in support of summary judgment.

#### 1. Whether BLM Took the Requisite "Hard Look" at the Project's Impacts on Desert Tortoises

Federal agencies must take a "hard look" at the potential environmental consequences of a proposed action. *Barnes*, 655 F.3d at 1131 (quoting *Earth Island Inst. v.*

*U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir.2003)). In particular, an agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must contain a "full and fair discussion of significant environmental impacts" as well as "reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. In order to identify the impacts that significantly affect the environment, the agency must consider both context and intensity. In the context of a site-specific action, "significance ... usually depend[s] upon the effects in the locale rather than in the world as a whole." *Id.* § 1508.27(a). Intensity "refers to the severity of impact" and considers various factors including "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA]." *Id.* § 1508.27(b), (b)(9).

An EIS must contain statements on (1) "the environmental impact of the proposed action"; (2) "any adverse environmental effects which cannot be avoided should the proposal be implemented"; (3) "alternatives to the proposed action"; (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and (5) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *McNair*, 537 F.3d at 1001 (quoting 42 U.S.C. § 4332(C)). An agency satisfies the "hard look" requirement by including these statements in its EIS and providing a full and fair discussion of environmental impacts. *McNair*, 537 F.3d at 1001.

Courts evaluating claims that an EIS is inadequate employ a "rule of rea-

son" standard, which asks whether the EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Allen*, 615 F.3d at 1130 (quoting *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir.2003)). Although an agency must consider "all foreseeable direct and indirect impacts" of its decision and should not "improperly minimize negative side effects," *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1180 (9th Cir.2011) (quoting *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir.2006)), "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Methow Valley*, 490 U.S. at 350, 109 S.Ct. 1835 (citations omitted).

### a. The FEIS' Description of the Existing Tortoise Populations

As before, Plaintiff asserts that the final environmental impact statement ("FEIS") is inadequate to meet NEPA's "hard look" standard because it "grossly understates the tortoise population on the Project site, precluding an accurate assessment of its impacts." (Pl.'s Mot. at 8.) Plaintiff maintains that BLM was required but failed to disclose in the FEIS that hundreds of juvenile tortoises and eggs were likely to be killed during construction of the ISEGS project.[3] (*Id.*)

---

3. Relying on a declaration by Dr. Michael Connor, Plaintiff asserts that "[d]estroying *all young tortoises* in the area means that *no* adults will reach maturity and *no* reproduction will occur, effectively exterminating an *entire generation* of tortoises and profoundly harming future populations." (Pl.'s Mot. at 10 n. 7 (emphasis in original) (citing Connor Reply Decl. ¶ 15 [Doc. # 85–1]).) The Court declines to consider Dr. Connor's declaration for several reasons. First, "administrative review [under NEPA] disfavors consideration of extra-record evidence" except in "limited circumstances" not applicable here. *Nw. Envt'l Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1144–45 (9th Cir.2006) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir.2005)). Furthermore, Dr. Connor's declaration does not establish that he is competent to provide expert testimony on this issue. *See* Fed.R.Evid. 702. He has a Doctorate of Philosophy in metabolic biology and has published primarily in the field of experimental laboratory science. (*See* Connor Decl. ¶ 3, Ex. 1 [Doc. ## 32–2, 32–3].) He has no training or professional experience in fields such as desert tortoise population ecology, population viability analysis, or biostatistics, that would qualify him to opine about the stability of desert tortoise populations. *See, e.g., United States v. Chang*, 207 F.3d 1169, 1172 (9th Cir.2000) (affirming exclusion of expert testimony under Rule 702 where purported expert had no qualifications in the subject matter at issue); *see also Nimely v. City of New York*, 414 F.3d 381, 399 n. 13 (2d Cir.2005) ("[B]ecause a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." (citation omitted)). Lastly, Dr. Connor's declaration does not support the proposition for which Plaintiff cites it. Dr. Connor expresses no affirmative opinion as to the impact that the death of juvenile tortoises on the project site will have on future generations of tortoises. Rather, he attempts to undermine Defendants' finding—that there will be no effect—through a conclusory critique of their reasoning. For all of these reasons, Dr. Connor's declaration is inadmissible.

Plaintiff later posits that the destruction of young tortoises will "annihilat[e] between 15 and 20 years of tortoise reproduction" (Pl.'s NEPA Reply at 7 n. 3) based on a statement in the draft EIS ("DEIS") that "tortoises do not typically reach sexual maturity until approximately 15 to 20 years of age" (DEIS at 6.2–58). This factual premise, however, does not logically lead to Plaintiff's conclusion. It appears in a discussion of raven predation on juvenile tortoises—a phenomenon that was already elevated in the ISEGS area prior to

The 2010 biological opinion ("2010 BiOp") is blunt about the likelihood that juvenile tortoises and eggs will be destroyed by the ISEGS project:

> [J]uvenile desert tortoises and eggs **are difficult to detect** during clearance surveys and construction monitoring; therefore, the potential exists that **surveyors may miss most of them** and they are likely to remain in the work areas during construction. Juvenile desert tortoises and eggs that surveyors miss during clearance surveys or project monitoring are **likely to be killed during construction.** Based on the estimates in the Environmental Baseline section of this biological opinion, we estimate that as many as 35 juvenile desert tortoises ... may be killed during construction.

(2010 BiOp at 45 (emphasis added).) Nonetheless, the 2010 biological opinion concludes, based on the scientific evidence available at that time, that the desert tortoise species in the Northeastern Mojave Recovery Unit would not be significantly affected:

> [A]reas disturbed by the proposed solar facility and its ancillary features would no longer support reproduction of desert tortoises. Most of the desert tortoises that currently reside within these areas will likely continue to reproduce after translocation. Consequently, we anticipate that the proposed action will not appreciably diminish the reproductive capacity of the species.
>
> Implementation of the proposed action would not appreciably reduce the number of desert tortoises in the Northeastern Mojave Recovery Unit.... [T]he number of desert tortoises and eggs that are likely to be lost as a result of the ISEGS project comprises a relatively small portion of the overall population in the Northeastern Mojave Recovery Unit.

(*Id.* at 53.) The record of decision ("ROD") approving the ISEGS project expressly incorporates the 2010 biological opinion and relies on its conclusion that "the proposed action is not likely to jeopardize the continued existence of the desert tortoise." (ROD at 32.)

■ Plaintiff disputes the sufficiency of including information about the destruction of juveniles and eggs in the 2010 biological opinion and other documents other than EIS. It asserts that Defendants "ignore the basic NEPA rule that all required information must be included *in the EIS itself."* (Pl.'s NEPA Reply at 5 (citing *Natural Res. Def. Council v. Duvall,* 777 F.Supp. 1533, 1538 (E.D.Cal.1991)).) Yet, NEPA requires only discussion of *significant* impacts. As the 2010 biological opinion makes clear, the destruction of eggs and juvenile tortoises at the ISEGS project site does not have a significant impact on the stability of the desert tortoise population. Thus, a discussion of this

the onset of construction—expressing concern about "any *cumulative* loss of juvenile tortoise due to the further addition of raven subsidies." (DEIS at 6.2–58 (emphasis added).) There is no basis to infer that the *one-time* destruction of juvenile tortoises on the ISEGS site will effectively destroy 15 to 20 years of tortoise reproduction. It may be as Defendants claim—albeit without authority—that "the eggs and juveniles in a particular location at any given time at most reflect the reproductive efforts of the current year and

years immediately preceding." (Defs.' Reply at 4.) Furthermore, adult and juvenile tortoises are not two monolithic populations; surveyors may miss some adult tortoises on the ISEGS site just as they may find and translocate many of the larger juveniles. In any event, as discussed below, the destruction of eggs and juvenile tortoises on the ISEGS site does not have a significant impact on the species within the Northeastern Mojave Recovery Unit and the FEIS was not required to discuss it.

impact in the FEIS was unnecessary. Plaintiff's suggestion that Defendants improperly relied on documents produced as part of ESA processes to reach this conclusion (*see* Pl.'s NEPA Reply at 5) has been rejected by the Ninth Circuit. *See Envt'l Prot. Info. Ctr. v. U.S. Forest Serv.* *("EPIC"),* 451 F.3d 1005, 1012 (9th Cir. 2006) ("Clearly, NEPA and the ESA involve different standards, but this does not require [the consulting agency] to disregard the findings made by FWS in connection with formal consultation mandated by the ESA.").

■ To the extent Plaintiff argues that the impact was significant to the preexisting tortoise population at the ISEGS site, "NEPA regulations direct the agency to consider the degree of adverse effect on a species, not the impact on individuals of that species." *EPIC,* 451 F.3d at 1010–11 (citing *Native Ecosystems Council v. USFS,* 428 F.3d 1233, 1240 (9th Cir.2005); *Greater Yellowstone Coal. v. Flowers,* 359 F.3d 1257, 1276 (10th Cir.2004)). Plaintiff criticizes this Court's prior reliance on *EPIC* in this respect. According to Plaintiff, *"EPIC* concerns an agency's decision to not *prepare* an EIS, not its *omission* of information *from* the EIS, and stands for the proposition that impacts to just a *few* individuals of a species do not necessarily constitute a significant effect on the environment, requiring *preparation* of a full EIS. EPIC does *not* change the fundamental NEPA precept that, *once prepared,* 'an EIS must contain a reasonably thorough discussion of an action's environmental consequences.'" (Pl.'s Mot. at 9–10 (emphasis in original; internal citation to *EPIC* omitted) (quoting *Nat'l Parks & Conservation Ass'n v. BLM,* 606 F.3d 1058, 1072 (9th Cir.2010)).)

Plaintiff's attempt to distinguish *EPIC* in this way is puzzling, given that *Duvall,* on which Plaintiff relies, also concerns an agency's decision not to prepare an EIS rather than the omission of information from an EIS. Regardless, Plaintiff's attempt to distinguish *EPIC* is unpersuasive. Just as an EIS must be created whenever a major federal action *"significantly* affect[s] the quality of the human environment,"* 42 U.S.C. § 4332(2)(C) (emphasis added), an EIS, once created, must fully and fairly discuss *"significant* environmental impacts,"* 40 C.F.R. § 1502.1 (emphasis added); *see also Barnes,* 655 F.3d at 1131. There is no obvious reason why the degree of significance of a particular impact necessary to trigger an EIS requirement would differ from the degree of significance warranting discussion of that impact within the EIS.

Defendants were reasonable in focusing their analysis on the adult population of tortoises. As the 2009 biological assessment ("2009 BA") points out, one benchmark by which FWS measures the stability of tortoise populations is the number of *adult* tortoises per square mile. *(See* 2009 BA at 4–3 ("[S]table tortoise populations are likely to have densities of at least 10 adults per square mile." (citing U.S. Fish & Wildlife Service, *Desert Tortoise (Mojave Population) Recovery Plan* (1994)).) Juvenile tortoises are shorter in length and more difficult to find in surveys. *(Id.* (discussing William I. Boarman, *Reducing Predation by Common Ravens on Desert Tortoises in the Mojave and Colorado Deserts* (2002))); *see also* Boarman, *supra,* at 3 ("[T]he juvenile component of desert tortoise populations is notoriously difficult to sample.").) Moreover, only 50–60% of young desert tortoises survive from year to year (2009 BA at 23) and tortoises do not achieve breeding status until 15–20 years of age (FEIS at 4.3–17).[4]

4. This is roughly consistent with the 2011

biological opinion, which found that only two

It was reasonable for Defendants to focus on the adult tortoise population, it was fairly discernable from the FEIS that they did so (see Order re Pl.'s Mot. for Prelim. Inj. ("Order") at 12), and the destruction of juveniles and eggs at the ISEGS site was found unlikely to have a significant effect on the species' overall population in the recovery unit. Therefore, Defendants did not need to discuss in the FEIS the project's consequences to a limited number of juveniles and eggs. An EIS should "be kept concise and ... no longer than absolutely necessary to comply with NEPA," 40 C.F.R. § 1502.2(c), and "discussion of other than significant issues" should "be only brief," id. § 1502.2(b). Defendants' focus on the adult tortoise population in the FEIS did not render their decision to approve the ISEGS project arbitrary and capricious. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim to the contrary.

### b. Analysis of Habitat Connectivity and Fragmentation Impacts

█ The Court previously found that Plaintiff raised "a serious question as to whether BLM violated NEPA by engaging in a cursory discussion of habitat connectivity and fragmentation without analyzing the potential impacts of habitat fragmentation on the Mojave population of the desert tortoise." (Order at 14.) Upon further consideration of the entire administrative record, the Court now concludes that this claim is without merit.

The 2009 biological assessment discusses the potential impacts from fragmentation of tortoise habitat and loss of connectivity due to the ISEGS project:

> Installation of the security and exclusionary fencing could result in direct effects such as mortality, injury, or

harassment of desert tortoises.... The fencing would preclude desert tortoises from re-entering. This would result in fragmentation of habitat and individual home ranges.... Blythe et al. (2003) found that translocated Sonoran desert tortoises moved less than 0.5 mile [sic] returned to their home ranges within a few days. Tortoises moved outside their home ranges would likely attempt to return to the area from which they were moved, making it difficult to remove them from the potential adverse effects associated with project construction. Removal of habitat within a tortoise's home range or segregating individuals from their home range with a fence would likely result in displacement stress that could result in loss of health, exposure, increased risk of predation, increased intraspecific competition, and death.

(2009 BA at 5–2.) It also discusses the baseline fragmentation caused by existing and reasonably foreseeable future projects in the Ivanpah Valley and in the vicinity of the ISEGS project area. (Id. at 3–7.)

The FEIS cites to the 2009 biological assessment (FEIS at 1–16) and itself discusses fragmentation and connectivity issues. For example, the FEIS discloses that tortoise habitat in the area is already or soon will be fragmented by existing and future developments on the ground. (See FEIS at 5–18 (acknowledging adverse effects from habitat fragmentation and loss attributable to planned 8,373–acre solar energy project nearby), 5–21 (noting the cumulative effect on habitat fragmentation posed by planned 7000–acre airport facility), 5–26 (discussing current linear features such as a railroad and interstate

---

to five percent of hatchlings survived to attain reproductive age (2011 BiOp at 65)—implying an average annual survival rate of 77–86% for

tortoises that take 15–20 years to reach reproductive maturity.

highway that have "effectively have fragmented habitat and eliminated the movement of terrestrial wildlife from major sections of the valley" and 3,500 acres of other developments such as casinos, retail facilities, and a prison), 5–26 to –29 (comparing fragmentation impact caused by loss of habitat from the ISEGS project to cumulative impact of all reasonably foreseeable projects).)

The FEIS also points out that "[i]nstallation of exclusionary fencing at the perimeter of the [ISEGS] project area would . . . fragment habitat for desert tortoise and home ranges of individual tortoises." (FEIS at 4.3–45.) Although "no critical habitat for desert tortoise would be impacted by the proposed project, the action is likely to adversely affect some individual desert tortoise and their habitat," in part as a result of "habitat fragmentation due to surface disturbance from the project." (*Id.* at 4.3–49.) In fact, the draft EIS describes habitat fragmentation as "[o]ne of the most substantial direct effects of the ISEGS project on desert tortoise." (DEIS at 6.2–51.) The FEIS additionally considered habitat fragmentation when considering potential alternative project sites. For instance, the FEIS observes that the Modified I–15 Alternative, which would place the project site near the existing interstate highway, "would reduce local habitat fragmentation, providing larger, contiguous areas of tortoise habitat." (FEIS at 4.3–80.)

Although the Court previously faulted the draft EIS and FEIS because these

documents "did not attempt to quantify the fragmentation effects" (Order at 13), Defendants persuasively argue that such quantification was impossible. (*See* Defs.' Mot. at 10.) When FWS prepared the 2010 biological opinion, it did "not have the ability to place a numerical value on edge effects and overall fragmentation that the proposed action may cause or that occurs in the recovery unit as a whole."[5] (2010 BiOp at 48.) Nonetheless, FWS found that "the area where the ISEGS project is located is already substantially cut off from the remainder of the Northeastern Mojave Recovery Unit by Interstate 15, Ivanpah Lake, Primm, Nevada, and the Clark Mountains. Although the construction of the ISEGS facility will increase fragmentation and edge effect in the area bounded by Interstate 15 and the Clark Mountains, it is unlikely to greatly increase fragmentation and edge effect when considered in the larger context of the recovery unit." (*Id.* at 48–49.)

Given that more precise numerical analysis of the fragmentation and connectivity impact was unavailable and in light of FWS' conclusion that the ISEGS project would not greatly increase fragmentation within the recovery unit, Defendants' discussion of the issue was adequate to satisfy NEPA's "hard look" requirement. *See Pac. Rivers Council*, 689 F.3d at 1020 (explaining that only "[i]f it is reasonably possible to analyze the environmental consequences in an EIS" is the agency "required to perform that analysis" (quoting *Kern v. BLM*, 284 F.3d 1062, 1072 (9th

5. Plaintiff assails any consideration of the 2010 biological opinion, among other reasons, on the ground that "referencing post-decisional information is improper." (Pl.'s NEPA Reply at 11.) The 2010 biological opinion is not post-decisional, however, as it was before BLM when BLM issued its record of decision. Review of agency action under the APA requires consideration of "the whole record" before the agency at the time of deci-

sion. 5 U.S.C. § 706; *see also Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1029 (9th Cir.2012) ("An agency has flexibility in deciding when to perform environmental analyses."); *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir.1993) (" 'The whole record' includes everything that was before the agency pertaining to the merits of its decision.").

Cir.2002))). Therefore, Defendants are entitled to summary judgment on Plaintiff's claim regarding fragmentation and connectivity impacts.

### c. Assessment of Translocation Impacts

 Plaintiff takes issue with the Court's Order denying a preliminary injunction for not fully addressing its argument that the FEIS—though acknowledging risks posed by translocation—"fails to quantify these risks or estimate the number of tortoise deaths that the translocation scheme will cause."[6] (Pl.'s Mot. at 12–13.) An agency, however, need not quantify *all* potential risks—where "incomplete or unavailable relevant data" precludes such quantification, the EIS merely "must disclose this fact." *Powell*, 395 F.3d at 1031 (citing 40 C.F.R. § 1502.22). As a corollary, *if* an agency relies heavily on particular data or a particular model *and* relevant shortcomings exist in the data or model, then the EIS must disclose such shortcomings. *See id.* at 1032 (holding that "NEPA ... requires up-front disclosures of relevant shortcomings in the data or models"). Here, neither of those two conditions occurred and Plaintiff's reliance on *Powell* is misplaced.

Plaintiff's citation to *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir.1998), also misses the mark. While it is true that "general statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided," *id.* at 1213 (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir.1998)) (internal quotation marks omitted), that is not what happened here. As noted below, the FEIS'

discussion of potential risks from translocation was sufficiently detailed.

More fundamentally, both *Blue Mountains* and *Powell* are inapposite. They concern an agency's obligation to disclose potential environmental impacts from the potentially harmful action under consideration. Translocation, in contrast, is a *mitigation* strategy, *i.e.*, a way to avoid, minimize, rectify, or compensate for those impacts. *See* 40 C.F.R. § 1508.20(a)-(e). NEPA requires only "that an EIS discuss mitigation measures, with 'sufficient detail to ensure that environmental consequences have been fairly evaluated.'" *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir.2009) (quoting *Methow Valley*, 490 U.S. at 352, 109 S.Ct. 1835). The appropriate focus is on the *effectiveness* of the mitigation measure at issue. *See id.* ("An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective." (citations omitted)). This is because an agency can rely on mitigation measures in determining whether an environmental impact is significant. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir.2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S.Ct. 2743, 2757, 177 L.Ed.2d 461 (2010). Thus, what matters here is not how many tortoises will be *killed* by translocation but rather how many will be *saved*.

The record contains ample detailed discussion of tortoise translocation and its effects. (*See* DEIS at 6.2–49 to –50, 6.2–72; FEIS at 4.3–44 to –49, 4.3–95 to –98, A.1–128 to –136; ROD at 12–13, 45; 2010

---

**6.** This is not entirely true. The FEIS cited a study finding an annual survival rate of 81–88% among tortoises that void their bladders while being handled and 96% among tortoises that do not. (FEIS at 4.3–45.)

1140

BiOp at 38–44.) As explained in the draft EIS, construction of the ISEGS project would give rise to a multitude of conditions that could cause tortoises harm or death. (*See* DEIS at 6.2–47 to –48.) To minimize these direct impacts, Intervenor proposed and Defendants implemented a number of protective measures including the installation of fencing to keep tortoises out of the project area, and the clearance and translocation of tortoises found in the project area. (*Id.* at 6.2–48.) While recognizing that translocation itself poses risks (*id.* at 6.2–48 to –49), the draft EIS estimated the mortality of translocated tortoises to be approximately 15% based on the opinion of a staff biologist. (*Id.* at 6.2–49.) The 2010 biological opinion, citing scientific studies, concluded that mortality among translocated and resident tortoises in the translocation areas is likely to be approximately 30%—no more than levels that those populations would experience in the absence of translocation. (2010 BiOp at 43–44 (citations omitted).)

In short, the discussion of translocation effects in the draft EIS and FEIS includes sufficient detail. It is clear that Defendants fairly considered the effectiveness and environmental consequences of the translocation strategy. This is all that NEPA requires. Consequently, Defendants are entitled to summary judgment on Plaintiff's claim that they failed to adequately assess translocation impacts.

### d. Analysis of Cumulative Impacts

Plaintiff asserts that the FEIS' cumulative impact analysis contains two deficiencies: a failure to discuss the interaction between the planned DesertXpress railway and the translocation scheme and an inadequate discussion of the ISEGS project's cumulative fragmentation and connectivity impacts. (Pl.'s Mot. at 15–17; Pl.'s NEPA Reply at 16–18.)

#### i. Cumulative Impact of the DesertXpress Railway

■ Plaintiff charges that the FEIS inadequately discussed the cumulative effects on tortoises translocated to the west of the ISEGS project posed by the DesertXpress railway. (Pl.'s Mot. at 15–17; Pl.'s NEPA Reply at 16–18.) As the Court previously explained, the DesertXpress route had not been established at the time the FEIS was issued and the cumulative impact of the two projects' operations depended on the route selected for the DesertXpress. (PI Order at 17 (citing FEIS at 5–16 to 5–17).) Thus, at the time of the FEIS for the ISEGS project, it would have been impractical for Defendants to analyze in depth the effects that one potential route for a future project might have on their mitigation efforts. Any such detailed analysis would have been more appropriately addressed by the EIS for the DesertXpress project once its route became finalized. *See EPIC,* 451 F.3d at 1014 ("[O]nce contemplated actions become more formal proposals, later impact statements on those projects will take into account the effect of the earlier proposed actions." (construing *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 20, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976))).

"Although it is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now," NEPA does not "require the government to do the impractical" if insufficient information is available to permit meaningful consideration. *Id.* (brackets, internal quotation marks, and citations omitted). Here, the FEIS indicated that the DesertXpress project might impact tortoises translocated to the west of the ISEGS project but that the magnitude of the cumulative impact on tortoises was uncertain. This was sufficient to comply with NEPA.

Plaintiff faults the Court for relying on information that postdates the FEIS in pointing out that the DesertXpress project will not require any further tortoise translocation. (*See* PI Order at 19.) While it is true that the record of decision for the DesertXpress project does not bear on whether the ISEGS project's FEIS adequately discussed the cumulative effects posed by the railway—and thus whether the FEIS complied with NEPA—the information *is* relevant insofar as it weighs against injunctive relief. (*See* discussion *infra* Part IV.D.) Even if, *arguendo*, Defendants inadequately discussed the cumulative effects posed by the DesertXpress project, the fact that the railway ultimately did not require a second round of tortoise translocation shows that any error was harmless rather than the source of irreparable injury. *Cf. EPIC*, 451 F.3d at 1014 n. 5 (noting that the agency later analyzed the cumulative effects posed by a subsequent project in the subsequent project's EIS).

### ii. Cumulative Fragmentation and Connectivity Impacts

In passing, Plaintiff asserts that the FEIS failed to discuss the cumulative impacts to the desert tortoise of habitat fragmentation and loss of connectivity. (Pl.'s Mot. at 17; Pl.'s NEPA Reply at 16.) Although it is true that the FEIS contains no separate discussion of these impacts within the cumulative impacts section, the FEIS adequately addresses them elsewhere (*see* discussion *supra* at IV.A.1.b.), which satisfies NEPA. *Cf. Ecology Ctr. v. Castaneda*, 574 F.3d 652, 667 (9th Cir. 2009) (holding that "[a]lthough the cumulative effects section of the ... EIS merely refers generally to 'past and proposed activities,' without listing details about those activities," the cumulative effects analysis was adequate because "other parts of the EIS give extensive history about past actions in the area").

In sum, Defendants took the requisite hard look at the ISEGS project's impacts to the desert tortoise population. Consequently, they are entitled to summary judgment on this issue.

### 2. Whether BLM Was Required to Issue a Supplemental EIS

Plaintiff next contends that BLM must prepare a supplemental EIS because of new information that came to light during the clearance of the Ivanpah unit 1 area. Quoting the 2011 biological assessment, Plaintiff maintains that this new information shows that "a larger number of desert tortoise will be affected within the site boundaries than originally anticipated" and "[c]hanges in the desert tortoise translocation strategy and area ... will affect the tortoise *in a manner not previously analyzed.*" (Pl.'s Mot. at 17–18 (quoting 2011 BA § 2.1) (emphasis in Pl.'s Mot.).) The Court previously rejected this argument in its Order denying Plaintiff's motion for a preliminary injunction. (*See* PI Order at 25–26 & n. 8.)

Plaintiff now argues that the conclusions in BLM's determination of NEPA adequacy—which allowed construction on the ISEGS project to resume—"starkly and irreconcilably conflict with the 2011 BA's admission that '[c]hanges in the desert tortoise translocation strategy and area' required by the unanticipatedly 'large[ ] number of desert tortoise[s]' affected by the Project 'will affect the tortoise *in a manner not previously analyzed.*'" (Pl.'s Mot. at 18–19 (quoting 2011 BA § 2.1) (emphasis in Pl.'s Mot.).) In so arguing, Plaintiff confuses the timeline. BLM issued its decision to suspend work on the ISEGS project on April 15, 2011 after clearance of the Ivanpah unit 1 area revealed the presence of more desert tor-

toises than expected. BLM issued its revised biological assessment only four days later as part of a reinitiated consultation with FWS to ensure ESA compliance. FWS then analyzed the issues raised in the 2011 biological assessment and issued its revised biological opinion, the document upon which BLM based its determination of NEPA adequacy, on June 10, 2011. (*See* PI Order at 7.) Thus, there was no "conflict" between BLM's statement in April 2011 that a larger-than-expected number of tortoises required a modified translocation strategy and area, the effects of which it had not yet analyzed, and its conclusion two months later—after analyzing the effects—that a supplemental EIS was unnecessary.

Plaintiff criticizes the determination of NEPA adequacy for "not even specify[ing] the new tortoise population and impact estimates, let alone put[ting] forth a convincing statement of reasons that explains why those new impacts will impact the environment no more than insignificantly." (Pl.'s Mot. at 18 (internal quotation marks and citation omitted).) Yet, there was no need for the determination of NEPA adequacy to specify the new tortoise population estimate because BLM had already done so in the 2011 biological assessment. (*See* 2011 BA § 2.3 ("The current anticipated number of [adult] tortoises ... within the project site is estimated at 86 individuals but could be as high as 162 individuals.").) Likewise, the 2011 biological assessment contains a detailed "analysis of the potential direct, indirect and cumulative effects to the desert tortoise resulting from revisions to the [ISEGS] project." (*Id.* § 5.1.)

The 2011 biological opinion also "focuses on the proposed changes to the translocation strategy, proposed modifications to desert tortoise handling procedures, and installation of desert tortoise fencing and culverts" (2011 BiOp at 3) and the effect that these changes would have on the species as a whole. It concluded that even under the revised population estimates and tortoise handling procedures, the ISEGS project "is not likely to jeopardize the continued existence of the desert tortoise." (2011 BiOp at 83.)

The determination of NEPA adequacy relies on both the 2011 biological assessment and the 2011 biological opinion in concluding that construction could resume. Thus, BLM adequately considered the new information cited by Plaintiff and reasonably concluded that a supplemental EIS was unwarranted. *See Marsh*, 490 U.S. at 374, 109 S.Ct. 1851 (holding that a supplemental EIS must be prepared only if "there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered."). Defendants are entitled to summary judgment on this issue.

### 3. Whether BLM Was Required to Consider the Eldorado–Ivanpah Transmission Line Project in the ISEGS EIS

Plaintiff maintains that the Court erred in concluding that the Eldorado–Ivanpah transmission line project and the ISEGS project were not "connected actions" requiring a single EIS to discuss both projects. (Pl.'s Mot. at 19–21; Pl.'s NEPA Reply at 21–28.) The Court need not revisit its conclusion, however, because the ISEGS EIS adequately considered the combined impact of the transmission project regardless of whether the two projects were connected. *See S. Coast Air Quality Mgmt. Dist.*, 621 F.3d at 1098 n. 5 (finding it unnecessary to determine whether two actions were connected where the EIS for

the action at issue "appropriately considered" the impact of the other action).

The draft EIS for the transmission project identified several cumulative impacts associated with the transmission line, which the ISEGS FEIS summarized. Most relevant here, the transmission project's draft EIS pointed out that "[t]he direct or indirect loss of listed or sensitive wildlife and associated habitat, including desert tortoise, would be adverse. This includes the contribution of the project to cumulative impacts to movement corridors and migratory paths." (FEIS at 5–15.) The ISEGS FEIS directed the reader to the draft EIS for the transmission line, which provided "a revised analysis of the project's direct, indirect, and cumulative impacts." (*Id.*)

Thus, even if Plaintiff is correct and the ISEGS and Eldorado–Ivanpah transmission line projects *are* connected, the ISEGS FEIS adequately accounts for the impact of both projects. The FEIS thus comports with both the letter and the spirit of the rules governing connected actions, the purpose of which is "is to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank,* 693 F.3d 1084, 1099 (9th Cir.2012) (quoting *Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 969 (9th Cir.2006)) (internal quotation marks omitted). Although Plaintiff argues that incorporation of the transmission line EIS by reference is inappropriate (Pl.'s NEPA Reply at 27–28), *Blank* indicates otherwise. *Cf. Blank,* 693 F.3d at 1099 (holding that agency's decision to prepare two EISes, each of which directed the reader to the other document where an issue more appropriately fell within the scope of that

project, "did not undermine its compliance with NEPA").

The ISEGS FEIS adequately highlights that there will be a combined impact from the ISEGS and the transmission line projects and directs readers to another publically available document for the most up-to-date discussion of this impact. NEPA requires nothing more. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim that they improperly segmented these two actions.

### 4. Whether BLM Adequately Defined a Public Purpose and Need for the ISEGS Project

Plaintiff again challenges BLM's statement of public purpose and need for the ISEGS project, claiming that the FEIS merely adopts BrightSource's own interests as those of BLM. (Pl.'s Mot. at 22–23; Pl.'s NEPA Reply at 28–30.) As Plaintiff raises no new arguments in support of its position that it did not already assert in seeking a preliminary injunction, the Court grants summary judgment on this issue in favor of Defendants for the reasons stated in its Order denying a preliminary injunction. (*See* PI Order at 27–28.)

### 5. Whether BLM Properly Rejected the Proposed Alternatives

██ Plaintiff reiterates its criticism of BLM's evaluation of proposed alternative sites for the ISEGS project. Plaintiff insists that the FEIS unreasonably rejected two potential alternative sites—one in the Ivanpah Dry Lake bed and one on private land at Harper Lake. (Pl.'s Mot. at 23–25; Pl.'s NEPA Reply at 30–34.) Plaintiff improperly conflates the requirement that BLM *"briefly* discuss the *reasons"* it eliminated any potential alternatives from detailed study, 40 C.F.R. § 1502.14(a) (emphasis added), with a nonexistent requirement that an EIS contain *evidence*

to support these reasons. (*See, e.g.,* Pl.'s Mot. at 24 ("NEPA ... requires an explanation of the putatively prohibitive costs and evidence that they would actually be higher than for other alternatives.").) "NEPA's requirement to assess alternatives ... is a procedural and not a substantive requirement." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,* 524 F.3d 938, 955 (9th Cir.2008). For the reasons set forth in the Court's Order denying a preliminary injunction, Defendants provided an adequate explanation why they did not discuss the Ivanpah Dry Lake Bed and private land alternatives. (PI Order at 28–31.) Consequently, summary judgment for Defendants is appropriate on this issue.

### 6. Whether BLM Took a Hard Look at the Impact on Special Status Birds

■■■ Plaintiff also repeats its attack on BLM's discussion of the impact on special status birds resulting from collisions with heliostat mirrors and burns from light reflected by the mirrors. (Pl.'s Mot. at 25–28; Pl.'s NEPA Reply at 34–35.) Plaintiff criticizes Defendants' failure to "upscale" a study by McCrary et al. that examined such impacts at a site that was 50 times smaller than the ISEGS site. Yet, as the Court previously explained, the FEIS acknowledges the McCreary study and summarizes its findings but explains that it would be inappropriate to extrapolate from the study because the conditions were significantly different. In particular, the McCreary study involved a site that—unlike the ISEGS site—contained large evaporation ponds that may have attracted birds and experienced poor visibility conditions such as fog or inclement weather that may have led to bird collisions with guy wires. (*See* PI Order at 21–23.) Given these differences, it was reasonable that

the FEIS did not attempt to upscale the McCreary data. Defendants did not fail to take a hard look at the impact on special status birds.

In sum, Defendants satisfied NEPA's procedural requirements. Therefore, their decision to approve the ISEGS project was not arbitrary and capricious and they are entitled to summary judgment on Plaintiff's NEPA claims.

### B. *Plaintiff's FLPMA Claims*

The FLPMA provides BLM authority and direction concerning the use and management of federal lands. *Gardner v. U.S. Bureau of Land Mgmt.,* 638 F.3d 1217, 1220 (9th Cir.2011). It requires BLM to "develop, maintain, and, when appropriate, revise land use plans," *id.* (quoting 43 U.S.C. § 1712(a)) (internal quotation marks omitted), which are sometimes referred to as resource management plans, *id.* (citing 43 C.F.R. § 1610.2). The relevant land use plan here is the California Desert Conservation Area ("CDCA") plan.

The FLPMA also requires the Secretary of the Interior to "take any action necessary to prevent unnecessary or undue degradation of the [public] lands." *Ctr. for Biological Diversity v. U.S. Dep't of Interior,* 623 F.3d 633, 644 (9th Cir.2010) (quoting 43 U.S.C. § 1732(b)) (internal quotation marks omitted). The requirement to prevent unnecessary or undue degradation of public lands is distinct from the requirement to comply with NEPA: "A finding that there will not be significant impact [under NEPA] does not mean either that the project has been reviewed for unnecessary and undue degradation or that unnecessary or undue degradation will not occur." *Id.* at 645 (quoting *Kendall's Concerned Area Residents,* 129 I.B.L.A. 130, 140 (1994)) (internal quotation marks omitted).

### 1. Whether Defendants Fully Analyzed All Feasible Alternatives to the ISEGS Project.

Under FLPMA regulations, BLM must, "in collaboration with any cooperating agencies, ... estimate and display the physical, biological, economic, and social effects of implementing each alternative considered in detail." 43 C.F.R. § 1610.4–6. This estimation is guided by NEPA's procedures and "may be stated in terms of probable ranges where effects cannot be precisely determined." *Id.*

 Plaintiff maintains that BLM "provided only a very truncated analysis of alternatives." (Pl.'s Mot. at 29.) Of the alternatives that BLM analyzed in detail, Plaintiff does not explain what additional analysis BLM should have performed. To the extent Plaintiff argues that Defendants ignored the CDCA plan's goal of "[a]void[ing] sensitive resources wherever possible" (BLM Supp. AR at 114 [Doc. # 117–3] ), Plaintiff ignores that the CDCA plan specifically requires consideration of "alternative fuel resources" (*id.*) and envisions approval of solar electrical generating facilities once NEPA requirements have been met. (*Id.* at 36.) Moreover, Defendants considered whether the proposed ISEGS project and the three viable alternatives would affect critical tortoise habitat and none did. (*See* FEIS at 4.3–2, 4.3–49, 4.3–81, 4.3–87.)

Plaintiff also argues that BLM "ignored feasible alternatives, such as the Ivanpah Dry Lake bed and Harper Lake private land alternatives, that posed fewer adverse environmental impacts." (Pl.'s Mot. at 29.) Yet, Plaintiff merely restates its argument—addressed above in connection with NEPA—that the Ivanpah Dry Lake and Harper Lake alternatives were in fact viable and should have been discussed in detail. For the reasons discussed above and in the Court's previous Order denying injunctive relief (PI Order at 28–31), these alternatives were not viable. The FLPMA regulation cited by Plaintiff requires only that BLM examine the "effects of implementing *each alternative considered in detail.*" 43 C.F.R. § 1610.4–6 (emphasis added). Because BLM reasonably chose not to discuss the Ivanpah Dry Lake and Harper Lake alternatives in detail, the agency had no obligation under the FLPMA to examine the effects of implementing these infeasible alternatives.

### 2. Whether Defendants Adequately Evaluated the ISEGS Project's Impacts on Desert Tortoises

#### a. Evaluation of Cumulative Impacts

Plaintiff next contends that Defendants inadequately evaluated the cumulative impacts on desert tortoises in violation of the FLPMA's general purpose of "provid[ing] for the immediate and future protection and administration of the public lands in the California desert within the framework of a program of multiple use and sustained yield, and the maintenance of environmental quality." 43 U.S.C. § 1781(b). Plaintiff hypothesizes that "each of the other projects in the area will likely rely on desert tortoise translocation programs" and complains that "no analysis of the overall impact of these multiple translocation programs has been conducted." (Pl.'s Mot. at 30 (emphasis omitted).)

 In fact, it is clear from the discussion in the FEIS that Defendants fully considered the cumulative impacts to various resources—including tortoises—posed by 17 foreseeable future projects in the area. (*See* FEIS at 5–1 to –56.) In particular, the FEIS focused on the six known projects that would have the greatest effect on tortoise habitat: ISEGS, Stateline Solar, DesertXpress, NextLight Solar, the Southern Nevada Supplemental Airport,

and the Southern Nevada Regional Heliport. (*Id.* at 5–26 to –28.) None of these projects are located in the areas to the west of the ISEGS site where tortoises are being translocated from the ISEGS project. (*See id.* at 5–7 to –13, 5–56.) In fact, Defendants specifically designed the translocation plan so that tortoises would not be subject to translocation more than once. (*See id.* at 4.3–48.) Thus, Plaintiff's concerns in that regard are unfounded.

### b. Preparation and Maintenance of Tortoise Inventory

Plaintiff also cites the FLPMA's requirement that the Secretary of the Interior "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values . . ., giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). Plaintiff maintains that Defendants failed to comply with this provision because they did not take an inventory of tortoises. Plaintiff asserts that Defendants did not know how many desert tortoises were present on the ISEGS site or have an accurate understanding of tortoise population densities in the surrounding areas. (Pl.'s Mot. at 30–31; Pl.'s FLPMA/ESA Reply at 13–14.)

The statute Plaintiff cites, however, requires an inventory for long-term planning purposes only. It has no application to individual land use decisions such as the one at issue here. *See* 43 U.S.C.

§ 1711(a) ("The preparation and maintenance of such inventory or the identification of such areas shall not, of itself, change or prevent change of the management or use of public lands."). Moreover, Defendants *have* conducted extensive surveys of desert tortoise populations, as recently as 2009, and based their decision to approve the ISEGS project on these data. (*See* FEIS at 4.3–17 to –19; 2010 BiOp at 22–28.)

Plaintiff fails to show that Defendants have not complied with the FLPMA. Therefore, Defendants are entitled to summary judgment on Plaintiff's FLPMA claims.[7]

### C. *Plaintiff's ESA Claims*

Section 7 of the ESA requires that federal agencies consult with FWS for any agency action within its jurisdiction that "may affect" a listed species or its critical habitat. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 909 (9th Cir.2012) (citing 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a)). First, FWS identifies any listed species that may be present in the action area "based on the best scientific and commercial data available." 16 U.S.C. § 1536(c)(1). The agency then prepares a biological assessment "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." *Id.* At the con-

---

7. Plaintiff objects that BrightSource "repeatedly cites to evidence outside of the administrative record" (Pl.'s FLPMA/ESA Reply at 2) and "insert[s] facts . . . that have no citation whatsoever and seem based on previously filed extra-record declarations" (*id.* at 3 (emphasis omitted)). As Plaintiff fails to identify the specific facts and evidence to which it objects, its objections are **OVERRULED.** The Court, however, has not considered any extra-record evidence except where noted. Plaintiff's objection to the font size of BrightSource's footnotes (*id.* at 3–4) is also **OVERRULED.** The Court has considered the entirety of Plaintiff's 35–page motion for summary judgment notwithstanding the 25–page limit set by Local Rule 11–6. While the Court prefers that both sides comply with all aspects of the Local Rules and seek leave of court prior to deviating from them, it would be inequitable to enforce the Local Rules' formatting requirements at this juncture—which are, after all, for the Court's own benefit—in a manner that elevates form over substance.

clusion of this formal consultation process, FWS presents the agency with a biological opinion that "determines whether the proposed action is likely to jeopardize the continued existence of a listed species or adversely modify its critical habitat." *Ctr. for Biological Diversity*, 695 F.3d at 909 (citing 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)).

If the biological opinion concludes that the action is not likely to jeopardize the species, but will likely result in some take,[8] FWS will provide an incidental take statement along with the biological opinion. *Id.* (citing 50 C.F.R. § 402.14(i)). An incidental take statement "specifies the impact (i.e., the "amount or extent") of the incidental take on the listed species [and] contains terms and conditions designed to minimize the impact." *Id.* (citing 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)). The ESA does not prohibit a take that complies with the terms and conditions of an incidental take statement. *Id.* (citing 16 U.S.C. § 1536(*o*)(2); 50 C.F.R. § 402.14(i)(5)). If the amount or extent of take specified in the incidental take statement is exceeded, FWS reinitiates consultation to ensure that the "no jeopardy" determination remains valid. *Id.* (citing 50 C.F.R. §§ 402.14(i)(4), 402.16(a)).

### 1. Whether FWS Adequately Supported Its "No Jeopardy" Conclusion

Plaintiff first claims that FWS violated the ESA because its conclusion in the 2011 biological opinion—that the ISEGS project would not jeopardize the continued existence of the tortoise—was "not only inconsistent with statements made elsewhere in the 2011 [biological opinion]," but also was "not adequately supported by any other evidence in the record." (Pl.'s Mot. at 33.) In particular, Plaintiff cites a statement that the ISEGS project "may further fragment populations and further constrict connectivity within the Ivanpah Valley" (2011 BiOp at 23) and a recommendation that BLM "consider alternative configurations for this project ... that would focus ground disturbance on lands closer to Ivanpah Lake that are likely to have fewer desert tortoises and are less crucial to population connectivity" (*id.* at 93). Plaintiff argues that these passages contradict FWS' conclusion that the tortoise's continued existence is not threatened in part because "population connectivity can be maintained through the habitat linkages that would remain between the existing developments in Ivanpah Valley." (*Id.* at 84.)

Plaintiff takes these statements out of context. The 2011 biological opinion finds that population connectivity will only be constricted *within* a small section of the Ivanpah Valley—a region that was already "significantly smaller than the minimum viable population size" and was already "completely or nearly isolated from the remainder of the desert tortoise population in the southern end of the Ivanpah Valley" because it was cut off by Interstate 15. (*Id.* at 76; *see also id.* at 45 ("Interstate 15 is mostly an impermeable barrier to movement of desert tortoises.").) This region comprises only 66,688 acres (2010 BiOp at 32) out of approximately 3,323 square miles in the Northeastern Mojave Recovery unit (*id.* at 48)—*i.e.*, it accounts for only about 3% of one of six tortoise recovery units. Moreover, even within this already isolated sliver of the desert tortoise population, "populations to the west and east of ISEGS would still largely be con-

---

**8.** To "take" under the ESA "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

nected" because population connectivity would remain to the north of ISEGS and BrightSource would install culverts underneath its access road. (*Id.*)

Thus, there was nothing inconsistent about FWS' conclusion in the 2011 biological opinion that the ISEGS project would not jeopardize the desert tortoise as a species, which was more than adequately supported by the record.

## 2. Whether FWS Used the Best Available Scientific Information

In addition, Plaintiff charges that Defendants violated the ESA "by failing to require or independently undertake admittedly feasible studies that would have supplied" what Plaintiff maintains is "missing information." (Pl.'s Mot. at 33.) Specifically, Plaintiff insists that "FWS made its connectivity finding in the absence of necessary studies to determine the extent and gravity of the Project's fragmentation and isolation of the desert tortoise populations in the Ivanpah Valley." (*Id.*)

■ It is true that FWS lacked "information on the demographics of the population west of Interstate 15" and therefore could not "confirm or estimate the magnitude of the effect associated with the development of ISEGS on the viability of *this* population." (2011 BiOp at 76 (emphasis added).) Yet, the viability of the population west of Interstate 15 was already threatened and its viability did not affect that of the species as a whole—the relevant inquiry. Similarly, the fact that BLM proposed a "genetic and demographic monitoring and adaptive management program" that would address the effects of the ISEGS project on the viability of the local tortoise population west of Interstate 15—"if they occur" (*id.*)—does not indicate that FWS made its connectivity finding with respect to the species as a whole "in

the absence of necessary studies" (Pl.'s Mot. at 33).

Furthermore, Plaintiff's underlying premise—that Defendants had an obligation to conduct additional studies to resolve any uncertainty in the existing data—is incorrect as a matter of law. FWS "*may* request an extension of formal consultation and request that the Federal agency obtain additional data" when FWS "determines that additional data would provide a better information base from which to formulate a biological opinion." 50 C.F.R. § 402.14(f) (emphasis added). When, as here, no such extension is requested or agreed to, FWS "will issue a biological opinion using the best scientific and commercial data *available*." *Id.* (emphasis added).

"The best available data requirement 'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'" *Kern Cnty. Farm Bureau v. Allen,* 450 F.3d 1072, 1080 (9th Cir.2006) (quoting *Southwest Ctr. for Biological Diversity v. Babbitt,* 215 F.3d 58, 60 (D.C.Cir.2000)). "Essentially, FWS 'cannot ignore available biological information.'" *Id.* at 1080–81 (quoting *Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir. 1988)). As Plaintiff "has not cited any scientific studies that indicate [FWS'] analysis is outdated or flawed," its assertion that Defendants did not use the best available scientific evidence fails. *Castaneda,* 574 F.3d at 659.

## 3. Whether the 2011 Biological Opinion Addresses the Entire ISEGS Project

Lastly, Plaintiff disputes that FWS addressed the full scope of the proposed agency action, claiming that FWS should have but did not analyze the Eldorado–Ivanpah transmission project as a connect-

ed action. (Pl.'s Mot. at 34–35.) As the Court has already determined with respect to NEPA, the transmission project is not a connected action. (*See* PI Order at 26–27.) It would "be implemented by a different applicant and would occur whether or not the ISEGS ... were implemented." (FEIS at 1–7.) Nonetheless, with respect to the ESA, "[e]valuating the scope of an agency action can be significant in determining the adequacy of a biological opinion" and the Ninth Circuit "interpret[s] the term 'agency action' broadly." *Wild Fish Conservancy v. Salazar,* 628 F.3d 513, 521 (9th Cir.2010) (quoting *Conner,* 848 F.2d at 1453) (internal quotation marks omitted).

As Defendants point out, the 2011 biological opinion *does* account for the transmission project as part of its environmental baseline. (2011 BiOp at 45–47.) Plaintiff acknowledges as much but argues that "FWS failed to adequately explain its conclusion" that "the transmission line project and the ISEGS Project would not create cumulative desert tortoise impacts that could jeopardize the continued existence of the species or destroy or adversely modify its habitat." (Pl.'s FLPMA/ESA Reply at 10.) Mainly, Plaintiff faults FWS for "not hav[ing] any quantitative information on the amount of the disturbance" to habit caused by the construction of the transmission line tower sites. (*Id.* (emphasis omitted) (quoting 2011 BiOp at 46).) Plaintiff fails to explain how the data relied on by FWS was outdated or flawed, however, and as discussed above, the ESA does not require FWS to obtain additional studies merely because some information is currently unavailable.

In sum, Plaintiff fails to show that Defendants' decision to approve the ISEGS project was arbitrary and capricious under the NEPA, FLPMA, or ESA. Consequent-

ly, Defendants are entitled to summary judgment.

### D. *Other Equitable Factors*

Plaintiff primarily seeks injunctive relief. Before the Court may grant final injunctive relief, Plaintiff must first establish "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto,* 130 S.Ct. at 2756 (quoting *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)) (internal quotation marks omitted) (involving claims under NEPA). Plaintiff does not address either the balance of hardships or the public interest factors. For the reasons expressed in its Order denying Plaintiff's motion for preliminary injunction (PI Order at 33–39), the Court finds that these factors continue to weigh against permanent injunctive relief.

## V.

### *CONCLUSION*

In light of the foregoing, Plaintiff's motion for summary judgment is **DENIED** and Defendants' and Intervenor's motions for summary judgment are **GRANTED.**

**IT IS SO ORDERED.**